MARITIME OVERSEAS
CORPORATION,
Petitioner,

v.

Richard ELLIS, Respondent.

No. 94–1057.

Supreme Court of Texas.

Nov. 15, 1996.

Linda Broocks, Thomas B. Greene, III, Houston, Joe R. Greenhill, Austin, Mard A. Antonetti, Jane A. Bland (Nenninger), Houston, for petitioner.

John M. O'Quinn, Gary M. Riebschlager, Eugene A. Cook, Kendall C. Montgomery, Maureen McPherson Spector, Joe H. Reynolds, Gael Plauche', Houston, for respondent.

PER CURIAM.

Application for writ of error are denied.

HECHT, Justice, dissenting from denial of application for writ of error.

By any standard I know of, the application for writ of error in this case should be granted. Consider this:

- The size of the damage award—over $8.5 million—certainly makes the case significant to the parties, a seaman and his employer.
- The central legal issue—what evidence is necessary to support liability in a toxic tort case—is unquestionably important to our jurisprudence. Each year in this state the issue recurs in hundreds of cases involving millions of dollars. Yet the issue has not been authoritatively addressed; it is, to quote the court of appeals, "one of first impression" in this state. 886 S.W.2d 780, 782 (Tex.App.—Houston [14th Dist.] 1994) (en banc).
- The issue is debated nationally by courts and commentators. *See, e.g., Daubert v. Merrell Dow, Inc.,* 509 U.S. 579, 595–97,

113 S.Ct. 2786, 2798, 125 L.Ed.2d 469, 484–85 (1993); *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 310 (5th Cir.), *modified on reh'g,* 884 F.2d 166 (5th Cir.1989), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990); *Christophersen v. Allied–Signal Corp.,* 939 F.2d 1106 (5th Cir.1991), *cert. denied,* [503 U.S. 912] 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992); PETER W. HUBER, GALILEO'S REVENGE: JUNK SCIENCE IN THE COURTROOM (1991).

- The issue has engendered dissents and conflicts in the courts of appeals. The appellate court panel's 2–1 opinion in this case was reversed by the court en banc, 5–2. 886 S.W.2d 780. The court noted that its decision conflicted with a unanimous panel opinion of another court. *Id.* at 785–786. The latter opinion was itself reversed by the other court en banc, 5–1. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 907 S.W.2d 535, 548–564 (Tex. App.—Corpus Christi 1994) (en banc), *rev'g* 907 S.W.2d 535, 539–548 (panel opinion).

- This Court has granted the application for writ of error in *Havner,* which, as noted, involves a similar issue. 39 TEX. SUP.CT. J. 237, No. 95–1036 (Feb. 9, 1996). That case was argued earlier this year and remains before us pending decision. If nothing else, the Court should hold the present case for the decision in *Havner.*

- The case has been well briefed by very capable counsel. Plaintiff is represented by John M. O'Quinn of O'Quinn, Kerensky, McAninch & Laminack; Joe H. Reynolds of Andrews & Kurth; and Eugene A. Cook and Gael Plauché of Bracewell & Patterson. (Mr. Reynolds' association with the case for the first time shortly before JUSTICE OWEN's departure from Andrews & Kurth to assume her seat on this Court disqualifies her from participating in the consideration of the case.) Defendant is represented by Linda Broocks of Ogden, Gibson, White & Broocks; Thomas B. Greene, III of Ware, Snow, Fogel, Jackson & Greene; and Joe R. Greenhill, Jane Nenninger

Bland, Marc A. Antonetti, and Margaret Niver McGann of Baker & Botts.

The only relevant consideration omitted from this list is whether the court of appeals' decision was incorrect. I am inclined to think it was, as I shall explain momentarily, although I would not want to make that decision without the benefit of argument and plenary consideration of the case. But even if the court of appeals were correct—a matter that at very least is in some doubt, as shown by the dissents in the court of appeals—that factor alone could not outweigh the others. We almost always hear cases as significant as this one irrespective of whether the lower court's decision was wrong. (Take for example *Maple Run at Austin Municipal Utility District v. Monaghan*, 931 S.W.2d 941 (Tex.1996), decided within the past month, in which the Court unanimously affirmed the district court's decision on direct appeal. Or take *Continental Airlines, Inc. v. Kiefer*, 920 S.W.2d 274 (Tex.1996), in which the Court unanimously affirmed the court of appeals' judgment.)

The present case is, in so many words, a Supreme Court case. If another case in the past eight years so deserved to be heard and yet was denied, I do not recall what it was. Why, then, are there not the requisite four votes to grant the application for writ of error? I cannot say, for two reasons. First, I simply do not know why some of my colleagues have chosen not to vote to grant the application in this case because they have not told me (they are not obliged to, of course), and it would be inappropriate for me to speculate as to their motives. Second, I cannot divulge the explanations some have offered because the Code of Judicial Conduct makes the Court's deliberations secret. *See* TEX.CODE JUD.CONDUCT, Canon 3, part B(11) (1996), *reprinted in* TEX.GOV'T CODE ANN. Title 2, subtitle G, app. B (Vernon Supp.1996) ("The discussions, votes, positions taken, and writings of appellate judges and court personnel about causes are confidences of the court and shall be revealed only through a court's judgment, a written opinion or in accordance with Supreme Court guidelines for a court approved history project."). Any

Justice could explain his or her position, just as I am doing here; none chooses to do so.

There are many reasons to vote to deny an application, and the MEMBERS of the Court often disagree. Most of the time my impression is that any Justice would be able to give a public explanation for his or her vote and would be willing to do so if the press of other cases were not so great. Sometimes, however—and I say this very, very reluctantly—the explanation for a vote would appear to lack much substance in the light of public scrutiny. If our votes on applications were always public, some would change. In this case, I believe the votes would have been different had they been public. The confidentiality of an appellate court's deliberations serves several good purposes; changing the outcomes of cases and evading individual accountability for our decisions are not among them. I am forced to conclude that the time has come for the Court to make public its votes on applications.

The facts of the case are relatively simple. While cleaning diazinon, a pesticide, out of a ship's pantry, seaman Richard Ellis was exposed for five hours to 100–200 times the level of the chemical considered safe. As a result, he experienced nausea, headaches, and eye problems. When, after two days, the ship put into port, Ellis was treated at a hospital and released. Ten months later Ellis sued his employer, Maritime Overseas Corporation, alleging that he was suffering delayed permanent neurotoxicity from his exposure to the diazinon causing eye problems, trouble sleeping, depression, anxiety, irritability, headaches, memory problems, high blood pressure, muscle weakness, and gastrointestinal problems. Ellis claimed damages under the Jones Act, 46 U.S.C.App. § 688 (1994), and under general maritime law for unseaworthiness of the vessel on which he was injured. Maritime Overseas does not dispute that Ellis suffered from acute overexposure to diazinon; it denies, however, that Ellis suffered any permanent injury from the exposure.

Nearly eight years after Ellis filed suit, the case was tried. (The case was tried before Judge Ken Harrison about the time ethics charges were raised concerning his conduct in other cases, which later forced his resignation. Stephanie Asin, *Harrison Resigns*

*Amid Alleged Ethics Violations—Commission Drops Charges, Inquiry,* HOU. CHRON., July 10, 1992, at 25; *Attorney Investigated Over Fees Approved by Civil Court Judge,* HOU. CHRON., March 12, 1991, at 15.) The jury found that Maritime Overseas' negligence caused Ellis' injury and assessed $8,576,000 actual damages as follows:

| | |
|---|---:|
| Loss of past earning capacity | $ 320,000 |
| Loss of future earning capacity | 1,890,000 |
| Past medical expenses | 38,000 |
| Future medical expenses | 850,000 |
| Past pain and mental anguish | 228,000 |
| Future pain and mental anguish | 4,000,000 |
| Past physical impairment | 250,000 |
| Future physical impairment | 1,000,000 |

The jury also awarded $1,000,000 exemplary damages for gross negligence and another $1,000,000 exemplary damages for Maritime Overseas' willful refusal to pay Ellis maintenance and cure. The district court rendered judgment on the verdict, including prejudgment interest, for a total of $12,447,728.

A divided panel of the court of appeals reversed and rendered judgment for Maritime Overseas, holding that there was no evidence to support Ellis' claim that he suffered delayed neurotoxicity from his exposure to diazinon. The panel consisted of Justices Robertson, Junell, and Draughn. Justice Draughn noted his dissent without opinion. The day after the decision was handed down, Justice Junell retired and was replaced on the court by Justice Bowers. The court then determined to rehear the case en banc. Chief Justice Brown recused, and before a decision could issue, Justice Bowers died. The seven Justices on the en banc court then divided 5–2, Justices Sears, Cannon, Ellis, and Lee joining Justice Draughn, and Justice Murphy joining Justice Robertson. The majority reversed the awards of exemplary damages and prejudgment interest and affirmed the remainder of the judgment for actual damages.

Maritime Overseas' principal complaint on appeal is that while Ellis' overexposure to diazinon undoubtedly caused an acute reaction for which he was successfully treated, there was no *probative* evidence that diazinon did or even *could* cause his alleged delayed neurotoxicity. This is not to say that there was no testimony at all that diazinon caused the permanent injuries Ellis claimed:

to the contrary, his expert witnesses said so. Maritime Overseas contends, of course, that Ellis' experts were wrong, and Maritime Overseas' own experts so testified. All this testimony is summarized in the court of appeals' opinions. 886 S.W.2d at 787–791, 804–807. The credibility of the experts as witnesses was a matter for the jury to decide and is not the subject of Maritime Overseas' no-evidence complaint on appeal. Rather, Maritime Overseas' argument is that Ellis' experts' testimony was not probative, as is must be to support recovery of damages, because it had no basis in fact.

Excluding the conflicting opinions of the trial experts, the scientific evidence on the long-term effects of diazinon appears to be essentially undisputed. Diazinon is an organophosphate. Exposure to some organophosphates—malathion and parathion, in particular—has been shown to cause long-term neurological effects in rats. Exposure to other organophosphates—e.g., adenine triphosphate (ATP)—does not. ATP occurs naturally in the human body and is needed for metabolism. There was no evidence at trial of any study showing that diazinon causes delayed neurotoxicity in humans or any other animals. But likewise, there was no evidence at trial of any study showing the contrary, that diazinon does not cause delayed neurotoxicity. Each opinion at trial concerning the long-term effects of exposure to diazinon—from Ellis' and Maritime Overseas' experts, alike—was based solely on the expert's qualifications and experience. There is nothing approaching hard fact to support either side.

The burden of proof, of course, in on the plaintiff. The central issue in this appeal, then, is whether a plaintiff can prove tort liability with an expert opinion based on nothing more than the witness' education and experience. In some contexts, such evidence is clearly not probative. For example, no hypothesis science has *dis* proved could ever support a judgment. To take an extreme case, no recovery for personal injuries suffered in sailing off the edge of the world will be affirmed on appeal, no matter how many witnesses testified at trial that the world is flat, or how educated and experienced they

claimed to be, or whether the jury chose to believe them. Even when science can demonstrate only that a theory is most unlikely, I doubt that it would be considered on appeal to be probative evidence in support of recovery. In this case, had there been evidence at trial of studies demonstrating as conclusively as science can that diazinon does not cause delayed neurotoxicity, I doubt seriously a judgment for Ellis would have survived appeal. The deficit in Ellis' expert testimony would be apparent.

The real difficulty is when science has not come to a firm conclusion. On the one hand, the legal system does not require that claims resting on scientific evidence fail if the evidence is anything but certain. On the other hand, the law cannot impose liability based on evidence that science itself would never take very seriously. Saying a thing does not make it so, however well-degreed the speaker may be, and however credible he may seem to a jury. There must be more to proof than this, even in a Jones Act case, in which the burden of proof is very light.

I do not suggest that there is a ready solution to this quandary. These issues divided the appellate court panel 2–1, then the court en banc 5–2. The court expressed its disapproval of the panel opinion of another court of appeals in *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 907 S.W.2d 535, 539–548 (Tex.App.—Corpus Christi 1994), which involved a similar issue. The unanimous panel opinion in *Havner* was later reversed by a divided en banc court 5–1, after one justice on the panel had retired and another changed positions. We granted application for writ of error. 39 TEX. SUP.CT. J. 237, No. 95–1036 (Feb. 9, 1996). My point is simply that we need argument as much in the present case as we do in *Havner*.

In my view, it verges on irresponsibility for this Court to refuse to give plenary consideration to an issue of such consequence. Issues that stir controversy in and among courts of appeals beg to be resolved, particularly where, as here, the issue is crucial in hundreds of cases litigated each year. Even if a majority of this Court believes that the judgment of the court appeals was correct, it should say so and resolve the controversy that will continue unabated until it does.

Today the Court granted the applications for writ of error in three cases, and the motions for leave to file petitions for writ of mandamus in two cases. The issue in *Worthy v. Collagen Corporation*, No. 96–0675 (opinion below at 921 S.W.2d 711 (Tex.App.—Dallas 1995)), is whether state law injury claims for collagen implants are preempted by the Medical Device Amendments to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 360c–360*l* (West Supp.1995), after *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). The issue in *Grain Dealers Mutual Insurance Company v. McKee*, (opinion below at 911 S.W.2d 775 (Tex.App.—San Antonio 1995)), is whether a corporation's automobile liability insurance policy covers the president's daughter. In *Williams v. Olivo*, (opinion below at 912 S.W.2d 319 (Tex.App.—San Antonio 1995)), the issue is whether a landowner is liable for injury suffered by a well-driller's employee who fell on a drill pipe thread protector. The issue in *Aramark Uniform Services, Inc. v. Tyson*, No. 96–0481 (mandamus; no published opinion below), is whether a plaintiff is required to make a prima facie showing of entitlement to exemplary damages before discovering evidence of defendant's net worth. The issue in *X.L. Insurance Company v. Mehaffy*, (mandamus; opinion below at 918 S.W.2d 687 (Tex.App.—Beaumont 1996)), is whether one of plaintiff's insurers is required to arbitrate a contribution claim against another of plaintiff's insurers if the only agreement for arbitration is between plaintiff and the other insurer.

While the issues in these cases are significant, both to the parties and to our jurisprudence, none of these cases is any more significant than the present case. Five votes were required to hear the mandamus cases; four votes were required to hear the others. Why were these cases granted and the present case denied? I cannot answer, partly because I do not know, and partly because I cannot say. I do not know what has motivated all of my colleagues because a Justice is not required to give a reason for refusing to vote for an application. What some have

said to me is confidential, although they are free to write as I have. I do not intend in any way to impugn the motives of other Justices. I have become convinced, however, that if each of the eight Justices participating in the decision had been constrained to explain his or her position publicly, the vote would have been different, and the application would have been granted.

I am fully aware of the benefits of confidentiality in appellate deliberations. Justice (now Chief Justice) William H. Rehnquist has summarized them thus: "candor on the part of the participants, full preparation [because no staff member is present to assist the justice on the U.S. Supreme Court—but this Court usually has staff members present], and a reasonable degree of harmony". William H. Rehnquist, *Sunshine in the Third Branch*, 16 WASHBURN L.J. 559, 567 (1977). To these may be added the burden of offering explanations in more cases when the Court already has plenty to do. CHIEF JUSTICE PHILLIPS has written an eloquent defense of the Court's practice not to announce the votes on applications that are denied, and an argument for not dissenting from such votes. *Dallas Morning News v. Fifth*, 842 S.W.2d 655, 661–663 (Tex.1992) (separate opinion). While I have the utmost respect for CHIEF JUSTICE PHILLIPS' views on this subject, the premise of his arguments, I think, is that Justices would not mind explaining their votes publicly if only the press of other business would allow but should not be forced to do so at the expense of opinions in cases granted. His arguments are valid only as long as the premise is valid. If instead a public announcement of the votes on applications that are denied would make Justices more deliberate and accountable in their consideration of those applications, then it seems to me the practice would do great good.

Surely none of the legitimate purposes of confidentiality justifies voting one way if the vote is not announced publicly and another way if it is. Confidentiality is intended to facilitate the work of an appellate court, not determine the outcomes of cases. The decision in a case ought never to turn on the fact that individual Justices are not obliged to explain their positions.

There is much less need for confidentiality in the votes on applications than in other aspects of the Court's deliberations. Appellate judges must have an opportunity to explore ideas with each other before taking public positions. I can scarcely imagine conducting our deliberations in the same environment as the Legislature, for example. But the need for candor in deliberations does not justify a lack of accountability in our decisions. This idea is neither novel nor renegade. Justice William O. Douglas discussed his views on the subject in his autobiography:

When I came on the Court [in 1939] Hugo Black talked to me about his idea of having every vote on every case made public. In cases taken and argued, the vote of each Justice was eventually known. But in cases where appeals were dismissed out of hand or certiorari denied, no votes were recorded publicly. I thought his idea an excellent one and backed it when he proposed to the conference that it be adopted. But the requisite votes were not available then or subsequently. As a result he and I started to note our dissents from denials of certiorari and dismissal of appeal in important cases. Gradually the practice spread to a few other Justices; and finally I ended up in the sixties noting my vote in all cases where dismissals or denials were contrary to my convictions.

WILLIAM O. DOUGLAS, GO EAST YOUNG MAN 452 (1974), *quoted in* COMMISSION ON REVISION OF THE FEDERAL COURT APPELLATE SYSTEM, STRUCTURE AND INTERNAL PROCEDURES: RECOMMENDATIONS FOR CHANGE 113 n. 2 (1975). Professor Karl Llewellyn has written:

It is as well to remember that neither secrecy of the court's deliberation or later secrecy about what went on during that deliberation rests in the nature of things or in any ordinance of God. The roots of each are either practical or accidental, and it is only either ignorance or tradition which makes us feel that we have here something untouchable, a semi-holy arcanum. We tend to forget that in common law history the centuries of the Year Books rest on a practice of conference, consultation, and decision going on in open court before ears and eyes of counsel, the bar at large, and the apprentices.... I personally suspect that our own secrecy

practice began when decision began to be postponed beyond the close of argument, with an eye to avoiding misapprehension and disappointment, and then to avoiding financial speculation. And I suspect the carry-over into later secrecy about past deliberations to represent partly a closing of ranks to protect the court from criticism or attack, and in later years a similar closing to allow free discussion with no possible repercussions in a re-election campaign. Thus the storied sanctity of the conference room represents to me as pragmatic and nonmystic a phase of appellate judicial work as the handling of the docket. Our modern fetish of secrecy reminds me of the shock German lawyers displayed at the notion of such dangerous things as published dissenting opinions.

KARL N. LLEWELLYN, THE COMMON LAW TRA-DITION—DECIDING APPEALS 324 n. 308 (1960) (citation omitted), *quoted in* Arthur S. Miller & D.S. Sastri, *Secrecy and the Supreme Court: On the Need for Piercing the Red Velour Curtain*, 22 BUFFALO L.REV. 799, 809–810 (1973).

I recognize the danger that publicly announcing votes on denied applications could lead an unscrupulous Justice to posturing for ulterior reasons. And I believe that CHIEF JUSTICE PHILLIPS' concern that the Court's time and resources not become too strained is valid. I believe that maintaining the confidentiality of votes on denied applications is generally the preferable approach. But when it allows decisions in cases which would not be made if public explanations were required, confidentiality becomes indefensible.

I would grant the application for writ of error in this case, set oral argument, and resolve the important issues presented after plenary consideration of the merits. To ensure accountability in our decisions, the Court should announce the votes to grant and those to deny in this and all other cases in which relief is denied.

OWEN, J., did not participate in the decision.